may please the court. My name is David Leinbach. I represent the appellate salespersons in this appeal. With the court's permission, I would like to reserve three minutes for rebuttal. Volkswagen salespersons are classified as exempt employees under California's Commissioned Salesperson Exemption. That exemption designation is being challenged in this case. Now, as a matter of pleading, there are several facts that must be accepted as true and cannot be disputed on this appeal. There's no dispute that Volkswagen, the franchisor, monitored salespersons' customer service interactions on an ongoing basis and directly compensated salespersons for how well they performed in those interactions. There is no dispute that Volkswagen also directly compensated salespersons for selling Volkswagen automobiles. Volkswagen even issued salespersons $10.99 as part of this direct compensation model. For purposes of this appeal, there can be no dispute that Volkswagen, the franchisor, required mandatory training in order to be certified as a salesperson. To the payment, please. There is no allegation as to how much, like what portion of the salesperson's compensation those payments consisted of. Is that right? That's correct, Your Honor. The allegations are that Volkswagen separately compensates for how they perform in customer service interactions if they're selling vehicles without putting a numeric amount on it. What if it's a $50 gift card at Target for each car sold? I mean, we don't know because there's no allegation. I guess what struck me is that in order to render your allegation to cross the plausibility threshold, didn't you have to give us, the court, some indication of, I don't know, it's 10% of a typical salesperson's compensation or something to indicate that it's a material portion of what they earn in order for this allegation to matter? Because otherwise we're just left, as I said, with, well, it could be a $50 gift card. Well, Your Honor, no, I don't think, I do not think it would need to be a, quote, material amount. I think when you look at how employees need to be compensated, you're going to look at how they receive all manners of compensation. Could be hourly, could be piece rate, commission, tips, whatever it is, and that's all going to need to be incorporated into, for example, their regular rate of pay for overtime purposes. It doesn't matter if it's $5. If that's an amount that would need to be... Right, but you have to figure, you have to convince us that it's a joint employer to start with, and that would, I think, on the wage issue, it means some sort of control over wages. So I was going to give an even more extreme hypothetical. I mean, if they get $1 for selling a car, it would still comport with your allegations, but I don't see how Volkswagen would be controlling the it would have basically no effect on the wages and yet still comport with how you allege this claim. Well, I'll elect to use the $1 example because I don't know how well the one penny example will work, but I do think that if you are directly compensating someone in a manner that that does factor in, that would factor into what their regular rate of pay would be in determining under California law what their wages are. It doesn't matter if it's $1 or $5 or $10. But then a customer who gives a tip at Starbucks becomes an employer. I became an employer this morning. How could that be right? Well, I don't think in that scenario, I don't think because in that sense, the customer is not benefiting, I suppose, in from their services and from a business standpoint, they're not, the customer is not in the business of selling coffee in that area, that would be more along the lines of if Starbucks had franchises and Starbucks directly commissioned people for every cup of coffee they sold, that would be Starbucks directly paying the wages. And I do that does make me want to touch on a point, which is Volkswagen does not have to completely control all the wages, or most of the wages or even a material portion of the wages. Martinez simply requires that they exercise control, not all control, it can be. But how would it count as control if it's less than 1%? Because they are necessarily have decision making power and exercise that power to directly compensate people for performing the service of selling Volkswagen vehicles. That's necessarily exercising control over their wages, they are directly compensating them for selling the vehicles. And that does bring me to an comprehensive control. Martinez specifically contemplates that these things, wages, hours, working conditions, different levels and amounts of control will be exercised by different entities in varying amounts, that that is the entire concept of the Martinez decisions that you can't simply divvy the responsibilities of some of these indica of an employer relationship. And then simply say, Oh, no, I don't do enough of this employer stuff to be counted as an employer. That's exactly what Martinez explained, it does not apply. And then again, this is also just it's not just the compensation, because then this is often why these cases are not decided at the pleading stage, that these invokes involve a host of factual determinations that are typically resolved on summary judgments. Because there are other facts that we evaluate these facts in the employee relationship, we have the compensation. Now, perhaps the evidence reveals that they only get 15 cents, or perhaps which maybe that's not enough in terms of however, the trier effect terms that issue, maybe they get $150. And that's plenty. Okay, well, what other facts are there? There's also the mandatory training. Well, let's even getting back to the compensation, it's the compensation they receive for customer service, also shows ongoing supervision monitoring of how you interact with customers. Yes, it compensates them. No, we have not alleged a specific amount. But that still leaves the allegation of the ongoing supervision for customers that is supervising their day to day activities. Even if it's not phrased as such, there's no dispute that we have alleged in an ongoing review of customer service. There's the training mandatory training that is conducted by Volkswagen, chosen at a location by Volkswagen. And we have alleged that is operate as a salesperson until you do that training. So what does that fact mean? That means that Volkswagen, in fact, can decide who can be hired to work at a Volkswagen dealership. If you don't complete the training, you're not certified, you can't work there. That is tantamount to the ability to hire. How do you distinguish the Salazar vs. McDonald's case on that? I appreciate the opportunity, Your Honor. And I do think issues related to both Salazar and Vasquez are going to be a pretty critical concern in this field. So I'll start with why Salazar is simply distinguishable. There is no evidence that McDonald's perpetually monitored employee customer service performance. There was no evidence that McDonald's, the franchisor, directly compensated McDonald's franchisee employees for anything. The training at issue in Salazar, that was training of managers of the franchisee who then trained the employees. There was no direct training from McDonald's to the employees. And going even further, unlike this case, there was no direct training from the franchisor to employees that had to be completed as a condition to being an employee at all. And this is critical because it confirms that Volkswagen effectively did have the right to hire dictating who could work. This is similar to what soon to be Justice Koh explained in the Perfect Day franchise case about the idea of operating as a gatekeeper. When you have mandatory training, you have mandatory certifications, and these are preconditions to working at the franchisee, that this would satisfy the suffer or permit standard as a gatekeeper function. Now, the other issue with Salazar and Vasquez is we have spent, we have asked this court to essentially follow Vasquez and not Salazar. My colleague has essentially asked this court to follow Salazar and not Vasquez. It's a strange scenario because, you know, California appellate courts, they don't have to follow the decisions of their sister courts. That's not the case in the Ninth Circuit. The Ninth Circuit is supposed to be bound by precedent. But these two cases, they really cannot be reconciled in terms of their approach to dealing with the joint employer question. Salazar relied heavily on the Supreme Court's decision in Patterson. But Patterson is an agency case. Patterson does not mention the phrase suffer or permit. Patterson does not mention control over work. I'm sorry, Vasquez is about whether someone's an independent contractor. It's not about joint employer, is it? It is, Your Honor. The question in that is someone misclassified? The question in Vasquez was, is the franchisor a joint employer with the franchisee of these other individuals who were allegedly misclassified by the franchisee? So it was a joint employer case. And that, and this, that, so I'll come back to Patterson. That's another huge distinction. The Salazar case outright dismissed Dynamex in kind of a breezy two-sentence paragraph, whereas Vasquez made Dynamex the entire core of its opinion. And now this is important because Dynamex, while it arose in a misclassification context, it's not a, quote, just a misclassification case. The core issue in Dynamex was how do we interpret the California wage orders phrase suffer and permit to work? That was the issue in Dynamex. And that was the issue in Vasquez. And that is the same issue we are presented with today. So the court in Vasquez came out to a completely different result on the joint employer issue in terms of understanding the suffer or permit to work as, as did the court in Salazar. And then the Salazar court in trying to understand the control over work hours, conditions, wages, it essentially bootstrapped Patterson's agency analysis. But again, Patterson doesn't even mention Martinez, not once. It does not mention any aspects of employment in the wage and hour context. So certainly the California Supreme Court did not think that Patterson was building off of Martinez because it never even mentioned. And that's another critical distinction because the Vasquez case outright dismissed Patterson as being completely irrelevant, not just in this That would seem strange, you would think that the Vasquez court would at least need to cite Salazar. He admitted it was a 2021 case, Salazar's a 2019 case. But the way this happened is these decisions weren't really two years apart. They were actually one week apart. It's a sordid lengthy history dealing with Valazar actually issued his decision before, I'm sorry, Vasquez issued his decision before Salazar withdrew its opinion, and then reinstated its opinion and certified one discreet question about retroactivity on the dynamics decision to the California Supreme Court. But it reauthorized the remainder of his published decision. One week later, Salazar issued his decision. So as best as appellants can tell, the Vasquez and Salazar panels were like two ships passing in the night speaking past each other, coming to completely contrary outcomes on very similar issues, treating Pasquez and I'm sorry, Patterson and dynamics in very different ways. But the Vasquez decision is the more persuasive decision is the one that should be relied on, because it is the case that cited all California authority that actually deals with interpreting the wage and hour rules, whereas the Salazar case relied on on agency authority that had nothing to do with California wage and hour law. And unless the panel has other questions, I would reserve the remainder of my time. That's fine. Thank you. It pleased the court. Andrew Finn from Sullivan and Cromwell on behalf of Volkswagen AG and Volkswagen Group of America. The district court correctly dismissed plaintiff's claims because the complaint does not allege any facts that could plausibly establish a joint employer relationship. Here, what we have in the complaint establishes on its own allegations on the thin allegations that are in it, that we have a typical automobile franchise relationship with its dealers. The dealers, as the plaintiffs admit in the complaint, are their employers. And under well settled law, including in Salazar, such a relationship is insufficient as a matter of law to render the franchise or a joint employer. I want to start before I go into the tests that that apply here. I want to start with this question about whether Dynamex or Vasquez apply. Both those cases are independent contractor cases. And in fact, the court in Salazar did expressly address whether the Dynamex standard, which is sometimes called this ABC test for employment, which shifts the burden on the putative employer to show that they're not an employer in an independent contractor setting, whether that implies that where that applies when your theory is joint employment. Here, the complaint states clearly that plaintiff's theory is joint employment. And Salazar says that, in fact, Dynamex has no place in that test. And in fact, this court just a few weeks ago, in an unpublished opinion, Williams versus Costco Wholesale Corporation. It's at 2021 Westlaw 5026837 confirmed in that case. Again, it was a joint employer theory case that the ABC test set forth in Dynamex does not apply to a joint employment claim and cited Salazar. So those cases are completely in opposite, and the district court correctly did not apply them to the complaint. What is striking in this complaint is, frankly, what is not alleged. What's not alleged is all of the typical indiction you'd see throughout California cases on wage and hour claims when somebody is trying to claim someone is their joint or regular employer. There's no allegation that any Volkswagen entity hired the plaintiffs, the three named plaintiffs here, or had any influence whatsoever on the hiring decisions. There was an assertion made today and also made in the reply brief of the appellants that mandatory training, I think today it was called a precondition of hiring. But if you look at the complaint, there's no allegation of anything like that. In fact, paragraphs 11 to 13, I believe, of the complaint, it's at ER 208 and going on to ER 209, set forth that, in fact, these plaintiffs were hired by the dealers to work as salespeople. And in fact, one of the plaintiffs alleged that he didn't get the certification which you get from training until the year after he was hired. So there's no allegation that this was a precondition of hiring. There's also no allegation. I think their theory is that, sure, you can get hired, but you're not going to be allowed to sell our cars. And so, as a practical matter, you know, the failure to complete the training precludes you from, you know, earning a livelihood selling Volkswagens. Well, Your Honor, the problem with that is that, again, there are no facts alleged that whether or not they're certified or not, Volkswagen prevents them in any way from working in any way, shape or form at the dealers. The training that they're talking about, which is alleged at ER 216, paragraphs 51 to 52, talks about a training on new products. And in fact, they only cite one instance where they don't even allege any named plaintiff actually attended the training. And it was about a March 2020 training on a new vehicle. This is a product training. This isn't a training about, there's no allegation that these are trainings about how they are going to do their jobs. And in fact, Why doesn't paragraph 53 support what Judge Watford's question was? It says they had to attend the training or they would not have been permitted to continue, it's even stronger, continue working at the dealership. That is what it says, Your Honor. But the key fact that's missing from this allegation and carefully missing from all the other allegations about this requirement on the dealers saying you can't employ anybody unless they have this training. And in fact, the complaint reflects that that's not the case because one of the plaintiffs, in fact, was hired and worked as a salesperson for in 2013 and says he didn't get his certification. He wasn't, he didn't become a commissioned salesperson until the year later. That's Plaintiff Armando Rodriguez and it's paragraph 12 in the in the complaint. So they're very careful about not specifying who exactly set out that, you know, this training was mandatory to be in order for them to be salespeople. And I think this is important because it also goes back to the allegation about wages and the payments, the direct payment from Volkswagen Group of America. Those were incentive payments, a promotion that according to the complaint were paid on a Visa credit card. And it was a promotion that they say was not the bulk of their compensation. In fact, they allege in the complaint that the bulk of their conversation of their compensation was, was in fact paid by the dealers through the commissions. I didn't really see anywhere where they said how much or hinted at how much. Where's this bulk allegation? Paragraph 24, Your Honor, it's at paragraph 24 of the complaint is where they say the bulk of the salespeople compensation. It's tethered to commissions. Doesn't that sound like it's from Volkswagen? No, Your Honor, because the complaint goes on to explain how the commissions are paid. The commissions, and in fact there's another place where the complaint talks about the payment from Volkswagen, the commissions are paid from the difference between what the dealer buys the car from Volkswagen and what the dealer sells the car to a customer. And according to the complaint, the salespeople, pursuant to however they have an agreement with the dealers, are able to get some, some portion of that commission. And in fact, there is in the And, you know, in fact, they're at ER 335 is the elite program. So, sorry, could I just interrupt? If, if 49% of their wages came from a Volkswagen directly as whatever you want to call them, commissions or something else, awards for selling cars, would that be control over wages? No, Your Honor, because I think the rate of pay for the employee, and that comes directly from the Fertrell versus payday California case that we cited, which is a California court of appeals case. And that's important because if you look at the power to actually set the rate of pay here, the allegations and the terms of the, of the agreement they, they say they had with Volkswagen to pay them these, these bonuses set forth very  those programs would be available to any of their employees. And according to the complaint, Volkswagen did not pay them and was not responsible for, for the bulk of their, their pay. But 49% would still not be the bulk. So I'm just wondering, I mean, if they really were paying 49%, that would seem like a joint employer, at least it would be a supportive of a joint employer idea. It might not be sufficient, but it'd be something. Well, I would agree with you, Your Honor, that in some sense, the amount does matter. But I also think that what is important for the definition, the test, the control over wages portion of the test is whether you have the right and authority to set the employee's rate of pay. And I think Martinez is instructive on this because in Martinez, these were, these were employees of the farm who were of the strawberries, who, according to the, according to the allegations, paid the farm upfront for the right to get these strawberries. And there were other allegations, but the vast majority, or actually, I'm not sure if it's vast majority, but, but in that there was an allegation that a significant percentage of the employees of the farms pay, of course, came from the purchaser of the strawberries, who was the putative joint employer. Not directly, right? Through the farm. So this would be a different kind of allegation here where they're alleging it comes directly to them from Volkswagen. Yes, Your Honor, but I don't think it matters who, who the payor is exactly. What matters is who controls whether or not the employee gets that money. And according to the terms of the, the, these programs, which are in the record, because the plaintiffs had originally made a claim that there was a breach of those agreements, and the district court took notice of those agreements as incorporated in reference. That was for the last complaint, though, right? Is that really before us when we're evaluating this complaint? Or I maybe have it in the wrong order, but it was a different complaint than the one we have before us, right? It was, it was a different complaint than you had before us. We, we, we re-raised it in, in the new motion to dismiss, in the last motion to dismiss, the last round. It's at, I believe, ER 60, page seven, note five of our opening brief on the last motion to dismiss. The district court didn't feel like it needed to get there, but we put those terms again before them. There was never a dispute about those terms. In fact, they dropped their, their, their contract claim when presented with those terms. But those terms make clear that the dealer controlled whether or not those, an employer could, an employee of theirs could participate in these programs. So I think, you know, the example is the Fertrell case about why it doesn't really matter who the payor is. In the Fertrell case, the, the payment company, the payroll company, was alleged to be the joint employer. And of course, the payroll company is, in fact, doing the physical payments and calculating the physical payments for employees. But the Fertrell court said, that's not enough under Martinez. That's also different though, because then they're just an agent of the employer. They're just, it's like the bank sending the money when you write a check. But the, this is still a different kind of allegation, potentially, if Volkswagen was giving them a significant amount of money directly. I would disagree respectfully, Your Honor, based on the fact that the dealers control whether or not the, the plaintiffs here could get that, any of that money. But also on the significance of the amount. In the sense that if they fire them, they won't get the money from Volkswagen? Or in what sense do they control whether Volkswagen sends them this visa card? The, the terms of the program say that the employees have to be employees of the dealer, and that at any time the dealer can opt out of the program. So it is the dealer's, it is the dealer's control to hire the person, and to whether they're opting in or opting out of this program at all times. And also on the amount here, it is interesting, they don't allege the amounts that they received. But also in the record, in the terms of these, these programs, which is at, I believe, 3 ER 335. It does, in fact, show the, the amounts of each payment, and it is in the range of $50. So while they haven't alleged anything about that, and I think they would have to in order to show that this was some sort of payment that went directly to them, but was contingent on an agreement between the dealers and Volkswagen, that they would have to allege something more in order to establish that Volkswagen had the right to pay, the control over the payment. I also want to, want to point out a couple of other things that aren't in the complaint that are typical in all the cases that you see. There's no allegation here that, that these plaintiffs in any way worked at any facilities that Volkswagen controlled. There's no dispute. Plaintiffs admit in their, in their, in their opening brief, at page eight, that Volkswagen, the dealerships are not owned by Volkswagen. And there's also no allegation that plaintiffs to show up at any particular time, to tell the plaintiffs what hours there would be at any particular given day, when their breaks would be, or what tasks they were required to do at any particular day. And, and finally, I also want to point out that in addition to the lack of any employment relationship being pled here, there's also no actual allegation that the main plaintiffs, we have a putative class here with three named plaintiffs, actually were not paid what California law requires at any particular time. And under the, the Twombly-Iqbal standard, we think that particularly in a joint employment relationship, where they're alleged to be employed by a third party that is, that we're not, we do not own, that they have to allege at least some period of time when they worked, what their hours were, and whether they weren't paid. The hypothetical scenario, they say occurred after 2015, but we don't see even any allegations of when these particular plaintiffs were faced with an issue where they weren't paid or didn't get appropriate breaks. Your Honor, in closing, sustaining plaintiff's claims, even on the pleading, even on the complaint here against Volkswagen, would require a dramatic expansion of California's definition of employers that no court has adopted and would have serious consequences for any manufacturer and distributor. We ask that this court affirm the district court's decision. Thank you. I think he had some time for rebuttal. You're muted. Thank you, Your Honor. The first point I'd like to make is the allegations in the complaint that my colleague suggests are missing regarding the mandatory nature of the training and how you cannot work at a Volkswagen without attaining this certification and attending this training is at paragraphs 48 through 50. Page 215 of the record, those expressly state you cannot work at Volkswagen until you complete this training. As for the allegations for Plaintiff Rodriguez that he obtained the certification a few months after he began working there, a careful reading of the complaint says that he worked at a Volkswagen dealership, not that he worked as a sales person. And in any event, whatever allegations applied to Mr. Rodriguez naturally would not apply to the broader allegations for him and everyone else. And again, the court must construe the complaint in plaintiff's favor in ruling on a motion to dismiss. I'm curious with the percentage breakdown, and this is why I earlier, Judge said that the percentage or the amount of the total compensation is irrelevant. Uh, that's because under my colleagues view of it, they could pay 99%. And as long as they delegated the authority to, quote, negotiate the rate of pay to the franchisee, Volkswagen is not the employer. Even if they paid 99% it still wouldn't matter. But that's not the law. That's exactly what Martina said. You cannot do. You do not get to divvy up employment responsibilities between entities and disclaim your status as an employer because of the bulk bulk of the compensation allegation. I don't know that he really took it that far. He's just saying, as long as it's not the majority, well, whether it's 49% and I think perhaps I heard him heard him wrong, Your Honor. But 49% certainly if you were 50 50 compensation, if that must qualify under Martinez for whether or not you have some control over wages and again, it's not about just negotiating the rate of pay because you can negotiate your rate of pay with an employer. But at the end of the day, California law decides the wages, what your regular rate of pay is, the wages to which you're entitled. And that's going to be all the compensation that you receive from your employers. And then the last point I just wanted to raise is that the dynamics, the dynamics issue in the Vasquez issue, Vasquez made clear that Patterson does not apply in the wage and hour context, not limited to the misclassification context. It is irrelevant to wage and hour employment relationships that can't be squared with Salazar. And Vasquez provided very thorough reasoning for why Patterson cannot impact the employment status inquiry. Thank you, Your Honors. Thank you, Counsel. Thank you, Counsel. We appreciate your arguments this morning. The matter is submitted at this time.
judges: PAEZ, WATFORD, FRIEDLAND